STATEMENT OF FACTS

1. On January 6, 2021, your affiant, Kevin M. Helson, was on duty and performing my official duties as a Special Agent. Specifically, I am assigned to the Federal Bureau of Investigation, tasked with investigating criminal activity in and around the Capitol grounds. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws.

2. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. On January 6, 2021, the U.S. Capitol was closed to the public and only authorized people with appropriate identifications were allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5.     At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol. However, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

6.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

7.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal laws, including scores of individuals inside the U.S. Capitol building without authority to be there.

8.      Following the events on January 6, 2021, the Federal Bureau of Investigation (FBI) received tips at the FBI National Threat Operations Center (NTOC) from individuals who reported they had observed a media interview of Jason RIDDLE by NBC10 Boston during which RIDDLE admitted to entering the U.S. Capitol on January 6, 2021. During the two minute and forty-two seconds video produced by NBC10 Boston, RIDDLE describes his observation of what other rioters were doing inside the U.S. Capitol by stating, "They were smashing computers, and printers, and breaking things, and throwing papers and lamps around." When asked by the reporter, "Why did you go in?" RIDDLE responded, "I just, I Just had to see it." When asked if RIDDLE regretted it, RIDDLE responded, "No."



A New Hampshire man who was at the protests in Washington, D.C., and even joined the mob storming the Capitol is now speaking out — saying he was proud to be there but didn't go there to break anything.

9.      Later in the interview, a digital image was displayed which showed RIDDLE holding a bottle of wine while standing inside the U.S. Capitol. RIDDLE describes his activities while inside the Capitol by stating that he "poured a glass of wine and watched it all unfold." He also described those he saw committing violent acts, stating, "[t]hose psychopaths going around breaking things and hurting people can rot in hell."

3

10. RIDDLE provided photos and videos of the events that day to NBC10 News. According to the reporter who spoke with him, RIDDLE stated that he took the videos himself. Some of the video footage depicted a group of protestors outside the U.S. Capitol. RIDDLE also apparently provided NBC10 News with a photograph of himself inside a lawmaker's office, holding a bottle wine he stole.



11. Investigators reviewed video footage and images taken from the U.S. Capitol that day that was submitted to the FBI tip line. Some of the footage captured RIDDLE walking up the steps toward the entrance to the Capitol and taking photographs with his cellular phone outside the Capitol apparently before his entry. At this point, RIDDLE appears to be holding only a cell phone and wearing a red sweatshirt/jacket and a red Trump hat.

 

12. At a time consistent with RIDDLE having exited the Capitol, he appears on video again, this time, for the first time, holding a book in his right hand, depicted in the following images below. The book was not seen in images of RIDDLE before he entered the Capitol.

 

13. On January 22, 2021, FBI Special Agents executed a court authorized Search Warrant on RIDDLE's registered address, located in Keene, New Hampshire, for digital evidence of RIDDLE's participation in the January 6, 2021 U.S. Capitol riots to include photos, videos, and

other images. During the execution of the search warrant, RIDDLE agreed to an interview with the FBI agents. RIDDLE was not under arrest.

14. During the interview, RIDDLE admitted to taking an Uber with two friends to the area near the Washington Monument in Washington, D.C., and estimated he arrived around 12:05 pm on January 6, 2021. RIDDLE described his movement from the Washington Monument toward the U.S. Capitol. His two friends did not want to proceed past the barriers and departed to get food. As RIDDLE got closer to the Capitol, he saw police standing in a line. People continued to move and push forward, closer to the Capitol building. One individual continued yelling instructions from on top of scaffolding, such as "move forward" and "keep moving." RIDDLE also described the rioters. RIDDLE stated that he saw many people dressed in military gear such as helmets and body armor, some of whom also had radios. At one point, he saw a man carrying a pitch fork. Another man carried a fire extinguisher filled with mace, which was orange when sprayed and was used against police near the scaffolding. RIDDLE also described the police response. He stated that the police lobbed flashbangs into the crowd, but that simply "fired people up." RIDDLE also stated that a man broke through the fence and people began climbing up the scaffolding. Soon afterwards, RIDDLE stated that he stopped on a small grassy patch, just to the left side of the front of the Capitol. He recalled spending approximately a half hour or so there, taking pictures and making phone calls. He then began to see Trump flags being waved inside the Capitol.

15. During his interview, RIDDLE also described when he and others entered the U.S. Capitol, what he called the "break in." He stated that a group accompanying a "big dude with a cane" made its way to the front. The "big dude."" who was approximately in his fifties, with glasses and a beard, broke a window with the cane and reached in and opened a door. Then people began

6

to rush in. RIDDLE stated that he waited for the initial rush to get by, and then followed and walked into the Capitol. There he saw papers everywhere, people breaking things, and he saw a man smashing printers and computers with what appeared to be a fence pole from the barriers outside.

16. RIDDLE also admitted that he walked into an office and found an open bottle of wine on or in a refrigerator and poured himself a glass. RIDDLE then admitted to drinking the wine and then leaving the office after being told to do so by a police officer.

17. RIDDLE admitted he also took a book from the office where he drank the wine. RIDDLE explained he took the book from a desk, believed it was titled something to the effect of "Senate Chambers" and described it as old looking, bound in reddish-brown leather, and it was "like a dictionary." RIDDLE stated that, shortly after he exited the Capitol, he sold the book to an unknown male individual for $40. RIDDLE also admitted that he stole a small Fox News football from the same office, but tossed it aside as he exited the Capitol building.

18. RIDDLE also stated that instead of leaving the U.S. Capitol, he continued to proceed into the building and described seeing individuals in body armor moving through the building "with a sense of urgency." RIDDLE noted these individuals communicated via radios and relayed directions to head right or left. RIDDLE explained after about a half hour, he decided to exit the Capitol.

19. RIDDLE also admitted that at some point after the Capitol incident, he had deleted some messages, photos, and videos of his D.C. trip from his phone, during what he termed a "delete frenzy."

20. On January 24, 2021, your affiant obtained surveillance video from the U.S. Capitol. At approximately 2:47:09 pm, as noted by the time stamp located in the upper left corner

of the video, RIDDLE is observed entering the U.S. Capitol and utilizing his cellular phone to record the rioting underway inside the Capitol. Shortly thereafter, RIDDLE is observed making a right turn into the Office of the Senate Parliamentarian.

21.     Further review of the surveillance video reveals RIDDLE leaving the Office of the Senate Parliamentarian after four minutes and twenty-five seconds. As depicted in the screen shots below, RIDDLE is observed standing at the doorway for several seconds before continuing on through the U.S. Capitol.

 

22.     On January 25, 2021, your affiant was provided access to the Office of the Senate Parliamentarian. Witness-1 (hereinafter "W-1"), an employee who works in the Office of the Senate Parliamentarian, viewed the photo RIDDLE took of himself with the wine bottle and made public, and W-1 confirmed that the photo was taken inside the Office of the Senate Parliamentarian. In addition, W-1 explained that the photo was taken from a spot near the refrigerator that housed wine in the Office of the Senate Parliamentarian.

23. On January 30, 2021, your affiant reviewed the digital evidence recovered from RIDDLE's mobile device seized on January 22, 2021. RIDDLE's phone contains several images taken outside the U.S. Capitol and from inside the U.S. Capitol to include the image RIDDLE provided to NBC10 Boston of himself holding a bottle of wine. One image which was located on RIDDLE's mobile device appears to be the "old looking, bound reddish brown leather book" as described by RIDDLE bearing the title, "Senate Procedure." The image appears to be taken outside the U.S. Capitol. After reviewing the below photo, W-1 confirmed that this book is United States Government property belonging to the United States Senate Office of the Parliamentarian.



24. In addition to the above image, RIDDLE photographed other rioters inside the U.S. Capitol during the time they were actively causing destruction and damages of U.S. Government property. W-1 also confirmed that the following photograph recovered from RIDDLE's cellphone was taken from inside the Office of the Senate Parliamentarian.



25.     Based on the foregoing, your affiant submits there is probable cause to believe that JASON DANIEL RIDDLE aka JASON RIDDLE violated 18 U.S.C. § 1752(a)(1) and (2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do so; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or attempts or conspires to do so.  For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will

be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

26. Your affiant submits there is also probable cause to believe that JASON DANIEL RIDDLE aka JASON RIDDLE violated 18 U.S.C. § 641 which makes it a crime to steal … or knowingly convert to his use or the use of another, or without authority, sells conveys or disposes of any record, voucher, money, or thing of value to the United States or of any department of agency thereof, or any property made or being made under contract for the United States or any department agency.

27. Your affiant submits there is also probable cause to believe that JASON DANIEL RIDDLE aka JASON RIDDLE violated 40 U.S.C. § 5104(e)(2)(D) and (G), which makes it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

_____
KEVIN M. HELSON, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this _____ day of February 2021.

_____
G. MICHAEL HARVEY
U.S. MAGISTRATE JUDGE