**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00304 (DLF)** |
| **v.** | : | |
| | : | |
| **JASON DANIEL RIDDLE,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Jason Daniel Riddle to 90 days of incarceration in this Class A misdemeanor case, a one-year term of supervised release, 60 hours of community service, $500 in restitution payable to the Architect of the Capitol, and $254 in restitution payable to the U.S. Treasury.

## I.       Introduction

The defendant, Jason Riddle, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Riddle pleaded guilty to one count of Theft of Government Property, in violation of 18 U.S.C. § 641, and one count of Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  As explained herein, a sentence that includes 90 days of incarceration is appropriate in this case.

1

The government is recommending this sentence because Riddle not only unlawfully entered the Capitol on January 6, but stole government property after doing so, then sought to capitalize on his crimes by claiming that it would help him get elected to Congress. All told, Riddle:

(1) unlawfully entered the Capitol through the Northwest Senate doors (also known as the Parliamentarian's doors), even though he was with friends who refused to pass police barriers and he observed a violent riot already unfolding;

(2) photographed the destruction in and around the Capitol and treated the chaos and disorder around him as an entertaining spectacle, even posing for selfie-style photographs in the middle of the riot;

(3) entered the Senate Parliamentarian's Office twice as it was being ransacked by others;

(4) stole a bottle of wine from that office, and drank the wine while watching the destruction of the office;

(5) stole the Parliamentarian's Senate Procedure book, valued at $254, then sold it outside the Capitol building for $40;

(6) gave a live interview on NBC10 Boston three days later, in which he admitted he entered the Capitol, witnessed destruction, drank wine he stole, and did not regret his actions;

(7) gave another live interview on NBC10 Boston in June 2021, months after being arrested and charged in this case, during which he expressed no contrition, but instead announced he was running for Congress and that his involvement in the riot and the resulting criminal case would be good for him, giving him valuable publicity for his run for elected office: "any attention is good attention, so I think it will help me;"

(8) destroyed evidence by deleting his social media accounts and deleting some messages, photos, and videos of his D.C. trip from his phone during what he termed a "delete frenzy;" and

(9) enthusiastically participated in the attack on the Capitol notwithstanding his prior service in the Navy and Army reserves; service during which he swore an oath to protect and defend the United States Constitution against all enemies, foreign and domestic.

In making this recommendation, the government has considered that Riddle gave a truthful interview to the FBI, pleaded guilty relatively early in this case, has a relatively minor criminal record, and has experienced personal challenges. But for those mitigating factors, the recommendation would be even higher, given the severely aggravating circumstances of Riddle's conduct on January 6 and his flaunting of that conduct in the months thereafter.

Riddle's participation in the riot that succeeded in halting the Congressional certification, combined with his theft of government property, his lack of remorse, and his attempt to benefit from his involvement in the riot, renders a sentence of incarceration both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense filed on November 18, 2021 ("Statement of Offense"), at 1-3.   ECF Doc. 22.   As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Riddle's conduct and behavior on January 6.

3

*Jason Riddle's Role in the January 6, 2021 Attack on the Capitol*

As Riddle admitted during his guilty plea and an interview with the FBI, on January 5, 2021, he drove from New Hampshire to Washington, D.C., with two friends to attend what has been termed the "Stop the Steal" rally on January 6, 2021.  On January 6, Riddle and his two friends took an Uber to the Washington Monument.  Riddle estimated that they arrived at the Monument around 12:05 p.m.  Soon after arriving, they began hearing other people talking about heading in the direction of the Capitol, and they began walking towards the Capitol with many people.  ECF Doc. 22 at ¶ 13.

As they approached the Capitol, Riddle separated from his two friends because, according to Riddle, his friends did not want to proceed past the barriers.  As Riddle proceeded without his friends and got closer to the Capitol, he saw abundant signs of the brewing violence.  He observed police officers standing in a line, but people continued to move and push forward closer to the building.  He observed one individual yelling instructions from on top of scaffolding such as "move forward" and "keep moving."  He saw many people dressed in military gear such as helmets and body armor, some of whom also had radios. At one point, he saw a man carrying a pitchfork.  Another man carried a fire extinguisher that Riddle believed was filled with mace, which was orange when sprayed and was used against police near the scaffolding.  Riddle stated that the police responded by lobbing flashbangs into the crowd, but that simply "fired people up."  He saw a man break through a barricade and others climbing up the scaffolding.  Soon afterwards, Riddle stopped on a small grassy patch on the northwest side of the Capitol.  He recalled spending approximately a half hour or so there, taking pictures and making phone calls. He saw Trump flags being waved inside the Capitol.   *Id.*

Riddle has described when he and others entered the U.S. Capitol as the "break in." He stated that a group accompanying a "big dude with a cane" made its way to the front. The "big dude," who he described as being in his fifties, with glasses and a beard, broke a window with the cane and reached in and opened a door. Other rioters then rushed through the door. Riddle stated that he waited for the initial group to enter, then followed them and walked into the Capitol. *Id.*

Surveillance video footage tracks Riddle's movements within the Capitol. He entered at approximately 2:47 p.m. through the Senate Northwest doors leading north into the Capitol. A drawing of the first (ground floor) level of the Capitol, with the Northwest doors in the red oval, is below:



Figure 1[1]

Figure 2, below, is a still shot from security footage and shows Riddle (circled in red) just after he entered through the Senate Northwest doors.



**Figure 2**

Riddle immediately proceeded into the Office of the Senate Parliamentarian.  Figure 3, below, is a still shot from security footage showing Riddle (circled in red) walking into the Parliamentarian's Office.

---

[1] This drawing can be found at https://docs.google.com/document/d/1hxXJrKhtDyf-1anm6g-wgp9DNNiy0dJp4KJKiNlXyAU/edit#heading=h.56y0ktk4a1f8



**Figure 3**

According to Riddle, he observed rioters smashing computers and printers and throwing papers and lamps inside the Parliamentarian's office.   One man was smashing printers and computers with what appeared to be a fence pole from the outside barriers.   Riddle took photographs of the chaos inside that office.  *See* Figures 4 and 5, Statement of Offense at ¶ 14.



**Figure 4**



**Figure 5**

Riddle remained inside the Parliamentarian's Office for approximately six minutes, until approximately 2:53 p.m.  One minute later, he reentered that office for another minute. Riddle has admitted that while in that office, he stole a bound reddish-brown leather book bearing the title, "Senate Procedure."  The book was the property of the U.S. Government, specifically the United States Senate Office of the Parliamentarian.  Riddle also stole a bottle of wine from that office and proceeded to drink a glass of that wine while watching the violent mob ransack the office.  *Id.* at ¶¶ 15-18.  He wasted no time celebrating in the Parliamentarian's Office and memorializing the event in a selfie-style photograph he took inside the office, Figure 6, below, all while members of Congress and staffers hid in a bunker or barricaded themselves in other officers.



**Figure 6**

This behavior is an aggravating factor in his case.  Opening and drinking a bottle of wine in a private office was a callous act of arrogance, a show of power and control. It showed that, in that moment, Riddle viewed the office as the dominion of himself and all the other members of the mob. When Riddle celebrated by drinking the wine and then photographed himself with the wine, moreover, he had already seen signs of violence: Rioters with battle gear carrying pitchforks and using what he believed was mace from a fire extinguisher; police firing crowd control munitions; the violent breaching of the Capitol; and the ransacking of the Parliamentarian's Office. This should not have been cause for celebration.

Security footage also captured Riddle carrying off the Senate Procedure book. Figure 7 shows Riddle (circled in red) holding the book in his left hand.



**Figure 7**

Additionally, Riddle stole a toy football that he found in that office.  At 3:01 p.m., Riddle exited the Capitol through the door from which he entered.  Figure 8 is a photograph he took after he exited the Capitol of the stolen book.



**Figure 8**

Riddle admitted that he discarded the football and sold the stolen book to an unknown individual for $40 after he exited the Capitol.  *Id.*  As Riddle stipulated in the Statement of the Offense, the book had an estimated fair market value of $254.  *Id.* at ¶¶ 20-21.

Riddle also admitted as part of his guilty plea that he knew at the time he entered the U.S. Capitol Building that he did not have permission to enter the building and that he paraded, demonstrated, or picketed inside the building.  *Id.* at ¶ 22.

*Social Media/Media Interviews*

Riddle admitted that at some point after the Capitol incident, he deleted his social media accounts, along with some messages, photos, and videos in his phone during what he termed a "delete frenzy."  However, three days after the January 6 Capitol Riot, he gave an in-person television interview on NBC10 Boston during which he admitted to entering the U.S. Capitol on January 6, 2021.  The interview is submitted as Exhibit 1A and can also be found here: https://www.nbcboston.com/news/local/nh-man-who-chugged-glass-of-wine-amid-capitol-riot-says-he-has-no-regrets/2276413/ .

During the two minute and forty-two seconds video produced by NBC10 Boston, Riddle described his observation of what other rioters did inside the U.S. Capitol:  "They were smashing computers, and printers, and breaking things, and throwing papers and lamps around." When asked by the reporter, "Why did you go in?" Riddle responded, "I just, I just had to see it." When asked if he regretted it, RIDDLE responded, "No."



A New Hampshire man who was at the protests in Washington, D.C., and even joined the mob storming the Capitol is now speaking out — saying he was proud to be there but didn't go there to break anything.

Later in the interview, a digital image was displayed which showed Riddle holding a bottle of wine while standing inside the U.S. Capitol. This image was also found by the FBI in Riddle's cell phone. *See* Figure 6, above.  Riddle described his activities to the NBC reporter while inside the Capitol by stating that he "poured a glass of wine and watched it all unfold."

In June 2021, months after being arrested and charged in this case, Riddle gave another in-person television interview about his involvement on January 6 to NBC10 Boston and again expressed no contrition.  To the contrary, he announced he was running for Congress and that this criminal case would be beneficial, in that it is giving him valuable publicity.  He stated, "any attention is good attention, so I think it will help me." He also stated that being involved in the Capitol riot is a selling point for his campaign, it tells people that, "I show up.  I'm going to actually keep my promises and, ah, make some changes."  This interview is being submitted to the Court as Exhibit 1B and can also be found at the following website:

https://www.nbcboston.com/news/politics/nh-man-arrested-after-he-chugged-wine-at-capitol-riot-says-hes-running-for-congress/2404498/.

*Jason Riddle's FBI Interview*

On January 22, 2021, weeks before his arrest, Riddle voluntarily agreed to an interview with the FBI.  Riddle gave a detailed description of what he purportedly did and saw in and around the Capitol on January 6.  This interview appears to have been a fair and accurate summary of his actions.  Riddle admitted to traveling with two friends from New Hampshire to Washington, D.C., on January 5, 2021, to attend former President Trump's rally.  He admitted that on January 6, 2021, he and his two friends marched towards the U.S. Capitol, but his two friends did not want to proceed past the barriers and departed.  Riddle admitted that he proceeded to the Capitol, unlawfully entered the Capitol after seeing the violence outside, witnessed the ransacking of the

Senate Parliamentarian's office, and stole the Parliamentarian's book, the football, and the wine. He also admitted that he sold the book to an unknown male individual for $40.  Riddle further admitted that at some point after the Capitol incident, he had deleted some messages, photos, and videos of his D.C. trip from his phone, during what he termed a "delete frenzy" and deleted his social media accounts.

*The Charges and Plea Agreement*

On February 5, 2021, Jason Riddle was charged by complaint with violating 18 U.S.C. §§ 641 and 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On or about February 8, 2021, he was arrested at his home in New Hampshire. On April 15, 2021, Riddle was charged in a five-count Information with 18 U.S.C. §§ 641, 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On November 18, 2021, he pleaded guilty to Counts Three and Five of the Information, charging him with a violation of 18 U.S.C. § 641, Theft of Government Property with a value of less than $1,000, and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  In the plea agreement, Riddle agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Riddle now faces sentencing for one count of violating 18 U.S.C. § 641 and one count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, a violation of Title 18, United States Code, Section 641, where the value of the stolen property does not exceed the sum of $1,000, carries a maximum sentence of one (1) year of imprisonment, pursuant to 18 U.S.C. § 641, a fine of not more than $100,000, pursuant to 18 U.S.C. § 3571(b)(5), a term of supervised release of not more than 1 year, pursuant to 18 U.S.C. § 3583(b)(3)

14

Riddle also faces up to six (6) months of imprisonment, a fine of up to $5,000, and five years of probation for a violation of 18 U.S.C. § 5104(e)(2)(G).  18 U.S.C.  § 3561(c)(2).  Riddle must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

## IV.    The Sentencing Guidelines for the Violation of 18 U.S.C. § 641

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, Riddle's adjusted offense level  is:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| Acceptance of Responsibility (USSG §3E1.1) | -2 |
| Total Offense Level | 4 |

*See* PSR at ¶¶ 34-42.

The U.S. Probation Office calculated Riddle's criminal history as a category I, which is not disputed. PSR at ¶ 45. Accordingly, the U.S. Probation Office calculated Riddle's total offense level, after acceptance of responsibility, at 4, and his corresponding Guidelines imprisonment

range at 0-6 months. PSR at ¶¶ 42, 94. Riddle's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. <u>See</u> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita,* 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. Riddle admitted that while his friends declined to cross police lines and barriers, he proceeded onward to the Capitol.  He witnessed the violence being committed against police, the destruction caused to breach the Capitol at the Northwest Senate doors and the ransacking of the Senate Parliamentarians' office.  Neither Riddle nor any other rioter was a mere tourist that day.

Additionally, this Court should assess Riddle's individual conduct in light of  a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction or other illegal acts; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and what he did, including with respect to government property; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

When Riddle entered the Capitol grounds, he knew he was participating in a violent riot. He admitted that as he was approaching the Capitol, he saw barriers and a police line and rioters engaging the police who were using flashbangs.  Although he knew his two friends decided to not cross the barriers, Riddle consciously made the decision to cross the barriers and police lines to

the Capitol.  In doing so, he saw people dressed in military gear, some of whom used radios. He witnessed a man carrying a pitchfork and another using a fire extinguisher that he believed was filled with mace to spray on the police.  Riddle intentionally involved himself in a violent and chaotic riot, and his presence only exasperated the untenable situation in which the police found themselves.  Riddle also saw the violent breaching of the Northwest Senate doors and took advantage of that to enter the Capitol.  The decision to cross police lines and barricades and enter the Capitol building after seeing a brutal riot, including the violent breaching of the Northwest Senate doors, reveals that he was not simply a tourist or peaceful protester, but someone intent on storming the Capitol.

Moreover, Riddle was not content simply to be a passive participant in the breach of the Capitol.  He actively encouraged other rioters when he broke open the bottle of wine he stole from the Senate Parliamentarian's Office to watch and celebrate the ransacking of the office.  Then, he decided to steal a Senate Procedure book and a toy football, apparently as souvenirs, but later sold the book to another rioter for $40.   As stated above, this was a heartless show of power and celebration during one of the most tragic moments in our nation's history.

Further, as a military veteran, Riddle was well-aware of the danger to police, Congressional members, and staff posed by the angry mob of which he was a part in a restricted building protected by armed officers.  Yet, far from trying to calm an already tense situation, Riddle joined the crowd in celebration, and then helped himself to the spoils of the riot.

Riddle's statements after January 6 show a total lack of remorse. Days after the riot, he told the NBC10 Boston reporter that he did not regret what he did.  When he was interviewed again in June 2021, months after he was arrested and charged in this case, he stated that this case was good publicity for his run for elected office and that his actions on January 6 were good selling points

for his campaign.  He has not shown any remorse to date regarding the wrongfulness of rioting in the Capitol, how he endangered others, and his theft of government property.

Finally, Riddle has admitted to deleting his social media accounts and destroying evidence after the riot by deleting videos and photos.  Accordingly, the nature and the circumstances of these offenses establish the clear need for a sentence of incarceration in this matter.

### B. Riddle's History and Characteristics

As set forth in the PSR, Riddle has a relatively minor criminal record. ECF Doc. 28 ¶¶ 43-50.

Riddle served in the U.S. Naval Reserves for eight years starting in February 2007.  He was honorably discharged from active-duty service in 2008.  In September 2009, Riddle was administratively separated due to certain physical or mental conditions.  He also served with the Army Reserves until 2016.  Riddle has had numerous jobs, most of which lasted for about a year. These jobs include corrections officer, waiter, bartender, and delivery person.

Riddle's military service renders his conduct on January 6 all the more troubling. As a former military service member, Riddle was well-aware that citizen status does not bestow upon a person the right to enter restricted government buildings.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[2] As with the nature and circumstances of the offenses, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was a year ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Riddle's actions, destruction of evidence, and news interviews clearly demonstrate the need for specific deterrence for this defendant. Riddle marched past police lines and barriers after his friends refused, he knew the police had deployed flashbangs, he saw rioters with military equipment and spaying chemicals on the police, and he witnessed the violent breaching of the Northwest Senate doors. Knowing all this, Riddle took videos and photos to memorialize what was happening, but then destroyed many of them in what he called a "delete frenzy." Riddle also entered the Parliamentarian's Office, uncorked a bottle of wine and watched the destruction of the Capitol unfold, all while sipping his congratulatory wine. He also participated by stealing government property that he immediately sold to another rioter. This, again, was an expression of power and was not a mere prank.

Riddle's persistent lack of remorse underscores the need for specific deterrence. Riddle told NBC10 Boston that he did not regret what he did and that this would be good for his campaign for elected office.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not become the default.[4] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Riddle has pleaded guilty to Counts Three and Five of the Information.  Count Three charges him with Theft of Government property, in violation of 18 U.S.C. § 641, a Class A misdemeanor.  18 U.S.C. § 3559.  Count Five charges Riddle with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant's actions in the Capitol contributed to the riot, his theft of government property, the nature of any statements he made (on social media, news media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "record" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v.*

*Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

The government has requested, and the courts have imposed, sentences of incarceration in cases where defendants entered the Capitol and displayed outrageous celebratory behavior inside sensitive and private areas in the Capitol.  In *United States v. James Bonet*, for example, the government recommended a 45-day term of imprisonment for a rioter who smoked marijuana inside Senator Merkley's office.  *See United States v. James Bonet*, 1:21-cr-00121 (EGS).  Judge Sullivan ultimately sentenced James Bonet to 90 days' imprisonment—twice the government's recommendation—in part because a television interview with the defendant on the one-year anniversary of the January 6 riot showed that the defendant lacked remorse for his actions.

Here, too, Riddle celebrated with a bottle of wine that he stole from the Parliamentarian's Office while the office was being raided, recorded his revelry with a selfie photograph, and he

failed to demonstrate genuine remorse for his participation in the January 6 riot. He has given two news interviews, one was months after his arrest in this case, in which he specifically stated that he did not regret his involvement in the January 6 riot and that he expected to benefit from it and the resulting criminal case when he runs for public office.

In *United States v. Adam Johnson*, 1:21-cr-00648 (RBW), the Court sentenced Johnson to 75 days of incarceration where he witnessed the violence outside the Capitol, entered the Capitol through a smashed window, temporarily stole the Speaker's podium and moved it to the Rotunda for a "photo op," was part of a mob that overwhelmed police guarding an entryway to the House Chamber, and deleted videos and photos from his cell phone as well as his social media account. This sentence was given despite several mitigating factors, including Johnson's voluntary surrender to the FBI just two days after the riot, his early and robust cooperation with law enforcement, and his willingness to accept responsibility. Here, Riddle's conduct was very similar. He witnessed the violence both outside and inside the Capitol, he entered the Parliamentarian's Office, celebrated with stolen wine, permanently stole the Parliamentarian's book, and destroyed evidence of his crime. And unlike Johnson, Riddle has been unremorseful.

In *United States v. Robert Lee Petrosh*, 1:21-cr-00347 (TNM), the Court sentenced the defendant to 10 days of incarceration, 12 months of supervised release, a $1,000 fine, and $938 in restitution. The defendant smoked a cigarette inside the Rotunda, stole two microphones off Speaker Pelosi's lectern, and positioned himself in front of a crowd that confronted officers.

In *United States v. Spencer*, 21-cr-00147 (CKK), the defendant received a 3-month sentence of incarceration where she entered the Capitol with her husband and minor child, was involved in a verbal altercation with a "counter-protester" outside the Capitol building, entered Speaker Pelosi's suite of offices when staffers were hiding, tried to get onto the house chamber

when members of Congress were hiding inside, and minimized her conduct in her interview.  In *United States v. Scavo*, 21-cr-00254 (RCL), the defendant was sentenced to 60 days incarceration based on entering the Capitol, taking video of the violent breach of the Rotunda doors, and making unremorseful statements.  In *United States v. Tryon*, 21-cr-420 (RBW), the Court sentenced the defendant to 50 days of imprisonment where officers pepper-sprayed him and hit him with a baton for refusing to comply and the defendant entered the Capitol through a door that had just been opened by someone who broke a window.  And in *United States v. Jeffrey Smith*, 21-cr-290 (RBW), a decorated military veteran with no prior convictions was sentenced to 90 days incarceration where he made comments to encourage other rioters and which were arguably threatening towards officers, attempted to open the Rotunda doors, later helped other rioters in opening the doors to let in a crowd of rioters, gave a fist pump in celebration, was not fulsome in his FBI interview, and made unremorseful comments on social media.  The government had requested a sentence of five months of incarceration.

Here, Jason Riddle's conduct was more serious than some of the cases discussed above. His thefts, involvement in the Capitol riot, his malicious celebration and attempt to exert control over the Parliamentarian's Office, his unremorseful statements, particularly when they were made to large television audiences, and his attempt to benefit from his actions in the riot and this case puts him in a more serious category of misdemeanants and warrants a sentence of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 418 (1990)

(interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[5]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[6] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual

---

[5] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).
[6] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, *5 (D.N.J. Jan. 15, 2020).  As relevant to Riddle's case, the sentencing court under the VWPA "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3).

Those principles apply in two different ways in this case.  First, Riddle's violation of 18 U.S.C. § 641 was "an offense against property . . . in which an identifiable victim . . . has suffered a pecuniary loss."  18 U.S.C. § 3663A(c)(1)(A) & (B).  Specifically, Riddle stole the Senate Procedure book from the Office of the Senate Parliamentarian.  PSR § 25.  That book is estimated to cost $254, PSR § 26, so restitution in that amount is proper under the MVRA.

Second, the parties agreed as permitted under 18 U.S.C. § 3663(a)(3) that Riddle must pay $500 in restitution to the Architect of the Capitol, which reflects in part the role Riddle played in the riot on January 6. Plea Agreement at ¶ K. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Riddle's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 125.

VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of significant incarceration, while some may support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jason Riddle to 90 days of incarceration, one year of supervised release, 60 hours of community service, $500 in restitution related to the damage to the Capitol and $254 in restitution for the value of the Senate Procedure book. Such a sentence protects the community, promotes respect for the law, deters future similar crimes by others, and deters future crimes by Riddle by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility, his truthful interview with the FBI, any personal challenges he has faced in his life, and his minor criminal record.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      /s/  _George Eliopoulos_____
GEORGE ELIOPOULOS
D.C. Bar No. 390601
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W., 4th Floor
Washington, D.C.  20530
Office: 202-252-6957
george.p.eliopoulos@usdoj.gov