UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | 1:21-cr-00304-DLF-1 |
| | ] | |
| JASON RIDDLE | ] | |
| | ] | |

**SENTENCING MEMORANDUM**

The defendant, Jason Riddle, by and through his counsel, Eric Wolpin, hereby files this sentencing memorandum respectfully asking that the Court sentence him to a total of thirty months of probation, $754.00 restitution, and sixty hours of community service. This proposed sentence falls within the Guideline sentencing range and is sufficient but not greater than necessary to meet the purposes of sentencing provided in 18 U.S.C. § 3553(a)(2) for the reasons set forth below.

## I.      Introduction

Jason is a military veteran in his late thirties. He is married and lives in New Hampshire. He has no criminal record. A supporter of then-President Trump, Jason traveled to Washington D.C. in January 2021 to see him speak. He expected to witness a presidential speech before traveling to a friend's house outside of Washington D.C. As the speech ended, Jason moved along with a sea of people walking toward the Capitol. After others forced open the Capitol doors, Jason entered the building and remained inside for fourteen minutes. He drank wine and walked out with a book. When Federal Bureau of Investigation (FBI) agents appeared at his home weeks later, Jason truthfully explained his actions and observations. He provided FBI agents with his phone. The multimedia files and communications it contained were consistent with statements he made to the FBI.

On January 6, 2021, Jason acted impulsively, but not violently. He violated the law and has pled guilty to two misdemeanors that will forever remain upon his

criminal record. In the year that has followed, Jason has been law-abiding and done nothing to suggest that he intends to steal, harm others, or unlawfully disrupt government administration. While on supervision, Jason has addressed a long-standing issue with alcohol and has remained employed. Considering his actions on January 6, 2021, as well as his circumstances and history, a sentence of probation, accompanied by community service and restitution, is "sufficient, but not greater than necessary," to achieve the statutory purposes of sentencing.

## II.     Framework for the Sentencing Analysis.

Jason pled guilty to two misdemeanors. ECF Doc. 8 at 2-3 (Information); ECF Doc. 21 at 1 (Plea Agreement). The presentence report (PSR) concludes that Jason has no scoreable criminal record and falls within Criminal History Category I. PSR ¶¶ 44-45; *Plea Agreement* at 3-4. The PSR calculates a total offense level of four for count three after applying a two-point reduction for acceptance of responsibility per U.S.S.G. § 3E1.1. PSR ¶¶ 39-42, 94. Count three has a Guideline sentencing range of zero to six months within Zone A. PSR ¶¶ 39-42, 94. The Guidelines do not govern count five. PSR ¶ 95. The Defense has no objection the Guideline range as calculated in the PSR. PSR ¶ 94. As the Guideline range is at its lowest point (zero to six months), the Defense does not seek a downward departure. Similarly, as the Guideline range of zero to six months is within Zone A, the Defense's request for a probationary sentence does not require a variance.

As the Court is aware, the United States Sentencing Guidelines are merely advisory, and courts are required to consider all factors listed in 18 U.S.C. § 3553(a) when imposing sentence. *Gall v. United States*, 552 U.S. 38, 53 (2007); *United States v. Booker,* 543 U.S. 220, 262 (2005). The paramount directive in 18 U.S.C. §3553(a) is that the Court must impose a sentence that is "sufficient, but not greater than necessary," to achieve the purposes underlying the sentencing statute. 18 U.S.C. § 3553(a). For the reasons discussed in greater detail below, considering the nature and circumstances of the offense, Jason's history and characteristics, the purposes of

sentencing, 18 U.S.C. § 3553(a)(2), and all other sentencing considerations set forth in 18 U.S.C. § 3553(a), a probationary sentence is warranted.

## III.  Military Service, Family Life, and Employment History.

Jason joined the Navy in 2007 at eighteen years old. A Navy "Evaluation Report and Counseling Record" from July 2008 described Jason as "My Top MP in Operation Department" and "A Future Petty Officer in the Making, Ready for Advancement Today!"[1] The same record identifies Jason as having "unlimited potential for professional growth." Jason's military records explained that he "consistently volunteers for additional tasks and pays particular attention to detail," "[h]is optimistic and energetic enthusiasm promotes high morale and a positive atmosphere," and he has "[e]xceled at every task given thus far." A similar record from October 2008, described Jason as a "[h]ighly motivated" "[m]eticulous professional," who "[e]xemplifies teamwork." While in the Navy, Jason won the "Global War on Terrorism Service Medal" and the "Navy Corp Achievement Medal," among other accolades.

In 2008, Jason was honorably released from active duty to the naval reserves in light of reoccurring struggles with alcohol use. In 2011, the Navy Reserve conditionally released Jason to the Army Reserve. Jason served with the Army Reserve from 2011 until 2016. In total, between the Navy, Navy reserves, and Army reserves, Jason served nine years in our country's military. Jason remains eligible for veteran's benefits and recently began receiving benefits through the Veterans Administration.

Upon release from the military, Jason, a Connecticut native, relocated to southern New Hampshire with his husband. Jason worked at various restaurants in the area before serving as a corrections officer in Vermont and New Hampshire. He then worked for the post office in New Hampshire. As Jason's childhood friend Anthony Ruggiero noted in the attached letter, Jason has a consistent work ethic,

---

[1] Jason's military records were provided to United States Probation in support of the PSR.

often working multiple jobs, and "never go[ing] a day without working." Exhibit A. More recently, Jason has worked for restaurants and delivery companies as a stocker and driver. As he has done throughout his life, Jason has remained employed during the pendency of this case and intends to continue to do so at its conclusion. In addition to work, Jason has a consistent interest in furthering his education. He has been taking graduate classes this semester as he considers a new career path.

The attached letter from Jason's husband describes Jason's personality and nature—boisterous and occasionally abrasive on the surface, but thoughtful and caring at his core. *See* Exhibit B (noting that "[b]eneath the bravado, charisma, and loudmouth is a man with a good heart."). Similarly, Anthony describes Jason as loyal, caring, and hardworking. Exhibit A. Jason's childhood and early adulthood were rife with family struggles. Anthony explained Jason's tumultuous decision to come out publicly as gay, first to him, and then to others, in his twenties. *See Id.* ("When he finally came out you could see pressure taken off him, and a couple years later I was standing next to him at his wedding when he married Bobby."). Both Jason's husband and his friend noted Jason's battle with depression and his efforts to cope with difficult events from his childhood. *Id. (*"Jason has battled depression his entire life due to childhood trauma."); Exhibit B (describing past alcohol use as "a coping mechanism for childhood trauma and a way to deal with emotions and situations he wasn't yet ready to handle"). Both letters paint a picture of Jason as a loyal, animated, and hard-working.

## IV. Struggles with Alcohol, Current Sobriety from Alcohol, and Compliance with Pretrial Release Treatment Conditions.

Jason has struggled with alcohol as an adult. While this case was pending, a friend and fellow corrections officer committed suicide. Jason became despondent and, among other things, went to his deceased friend's former home while inebriated and made statements about self-harm. That situation led this Court to impose a breathalyzer condition—monitored by United States Probation in New Hampshire— that has been in effect for five months. Since the imposition of this condition, Jason

has maintained his sobriety from alcohol but for one admitted relapse in December 2021. Jason's significant progress while on supervision is summarized in United States Probation's March 24, 2022, pretrial status report. ECF Doc. 30. Additionally, per release conditions imposed upon Jason's arrest on this charge in February 2021, he has been attending regular counseling sessions with a local mental health provider. PSR ¶ 64. Jason has succeeded with these interventions and his compliance with their requirements demonstrates a willingness and ability to comply with conditions of supervision.

## V.    Offense Conduct.

Jason has had a longstanding interest in politics. After his time in the military, Jason earned a Bachelor of Arts in Political Science from a Connecticut University. While in New Hampshire, Jason engrossed himself in the local political scene. As a result of its first in the nation primary status, New Hampshirites routinely hear from and meet with visiting politicians pursuing national office. Jason followed candidate and then-President Trump and attended his political events. Jason was not and has never been a part of a political group that advocated for violence or employed violent rhetoric. Jason's primary political affiliation was with a small, local, rural group of gay New Hampshire Republicans.

Jason traveled south in January 2021 with two friends. The plan coalesced around a visit to a home owned by Jason's friend south of Washington D.C. The trip was not organized by a larger group. Jason was not part of a caravan or a chartered bus. The plan was to pass thorough Washington D.C., spend the night, attend a final Trump speech, and travel to Jason's friend's house. Jason brought no accoutrements of violence (zip ties, body armor, OC spray, *etc.*) with him. His only expectation for January 6, 2021, was to see President Trump speak. As Jason explained to the FBI later that month, he "did not expect the rally to change anything as far as the election results, but he wanted to show his support for the President. Jason had not planned

to take part in any illegal activities and did not coordinate or receive instructions from anyone or any groups."[2]

A miscommunication with an rideshare driver on the morning of January 6, 2021, led Jason and his friends to arrive late to Trump's speech. Jason heard little of the speech, but found a mass of people, many in Trump regalia, moving in the direction of the Capitol Building. People were shouting and using megaphones, urging folks to "keep moving forward." Jason separated from his friends and continued with the crowd toward the Capitol. Jason stopped for about a half-hour at a small, grassy patch near the building's front door. He filmed those around him and called a family member to describe the scene. Jason was alone. He was not urging others to act and remained a passive observer. He saw others break windows and open the building's doors. After an initial rush of people entered, Jason walked into the Capitol.

Once in the building Jason, walked into an office. He opened a bottle of wine and drank some of its contents. He took a book. He had no particular interest or motivation to do so; the book, as he explained to the FBI, was "like a dictionary" and his decision to take it was impulsive. While in the office, a law enforcement officer appeared and told Jason to finish his wine and leave the room. Jason complied with the officer's request. Jason searched for an exit and left the building. Government surveillance footage (a "trace") shows Jason entering the Capitol at 2:47 p.m. and leaving at 3:01 p.m. In total, Jason was inside the Capitol for about fourteen minutes. Upon leaving the building, Jason spoke to a stranger and exchanged the book for $40.00. Jason reconnected with his friends, and they traveled to their planned destination.

## VI.   Jason's Interactions with FBI Investigators.

The FBI visited Jason's home in New Hampshire later that month. Jason told the FBI about the events of January 6 , 2021, in much the same form described above.

---

[2] All quotations from this section are taken from an FBI 302 drafted on January 25, 2021, provided to the Defense in Discovery.

He acknowledged entering the building, drinking wine, and taking a book. Jason explained to the FBI that he took pictures and videos on January 6, 2021, but that he had taken down or deleted some messages and multimedia from his trip "during a 'delete frenzy,' since he was worried about his husband seeing everything." As noted by the FBI, Jason was able to "find most of [the messages, photos, and videos] in some form, whether on the phone, in Facebook Messenger, or in text messages sent to others," to provide to law enforcement. Jason consented to the FBI taking his phone for review and analysis. The photos and video on the phone were consistent with Jason's recounting of the day's events to the agents.

Near the end of the interview, The FBI asked Jason "if he would have done anything differently, Riddle said he would have 'just stayed away from the building.'" As described by the FBI, he "reiterated that he originally only thought he was going to attend a rally for President Trump at the White House, but then, people began directing everyone towards the Capitol. When asked if he believed people intended to disrupt the election certification process, Riddle said he, 'didn't even know what was going on inside until afterwards.'"

## VII. Misdemeanor Sentences Imposed by this Court Stemming from Conduct on January 6, 2021, Support the Defendant's Proposed Sentence.

Counsel is aware of nine cases that this Court has sentenced in relation to the events of January 6, 2021.[3] Although the specific charges may vary, these defendants, like Jason, pled guilty to misdemeanor level, non-violent offenses. The Court sentenced the defendants to probationary sentences, with some variation in the probationary term and the use of home detention:

---

[3] The information included in this chart was gathered from Government filings in other cases and from contact with the local Public Defender's Office. These are all such cases known to Counsel at this time.

| Defendant | Docket | Prob. (mo) | Home Det. (mo) |
|---|---|---|---|
| Wangler, Douglas | 1:21-CR-00365-DLF | 24 | 0 |
| Harrison, Bruce | 1:21-CR-00365-DLF | 24 | 0 |
| Dillon, Brittiany | 1:21-CR-00360-DLF | 24 | 3 |
| Schwemmer, Esther | 1:21-CR-00364-DLF | 24 | 0 |
| McAlanis, Edward | 1:21-CR-00516-DLF | 24 | 0 |
| Williams, Andrew | 1:21-CR-00045-DLF | 24 | 0 |
| Straka, Brandon | 1:21-CR-00579-DLF | 36 | 3 |
| Kostolsky, Jackson | 1:21-CR-00197-DLF | 36 | 1 |
| Walden, Jon | 1:21-CR-00548-DLF | 36 | 1 |

Although the Court needn't track prior sentences and must consider aggravating and mitigating factors unique to each defendant and offense, past sentences for misdemeanor-level, January 6, 2021, offenders are valuable data points in crafting an appropriate sentence in this case. 18 U.S.C. § 3553(a)(6) requires that the Court "consider" "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2) also invokes the "need for the sentence imposed" to, among other things, "promote respect for the law." Providing like sentences among like defendants not only avoids unwarranted sentencing disparities, but promotes respect for the law as a fair, consistent, and considered mechanism for holding law breakers accountable.

In each of the above noted cases, the Court considered the particular circumstances of the defendant's offense and his or her individualized history. In many of the cases noted above in which the Court imposed a probationary sentence, the defendant entered the Capitol aware that violence preceded his or her entry, took photographs and videos while inside, expressed solidarity with the surrounding atmosphere, remained in the Capitol, expressed limited "remorse," and deleted media files showing his or her involvement. *See e.g., United States v. Harrison*, 21-CR-00365-DLF, Gov't Sent. Memo, ECF Doc. 48, 3-8 (the defendant "saw a violent mob clashing with law enforcement," entered the Capitol, recorded a video of his friend

inside the Capitol pumping his fists and chanting "USA," posed for photos inside the Capitol, remained in the Capitol for twenty minutes, and "attempt[ed] to delete videos and photos he had taken in Washington, D.C., once he saw that people who had entered the Capitol Building were 'getting into trouble.'"); *United States v. Kostolsky*, 21-CR-00197-DLF, Gov't Sent. Memo, ECF Doc. 41, 1-2 (the defendant scaled a wall to enter the Capitol, "proudly texted friends that he scaled the wall, got tear gassed, 'caught a rubber bullet,'" "told one person 'I had fun' and the politicians were 'crawling in fear,'" "first denied entering the Capitol when talking to the FBI," and "deleted videos from his telephone."); *United States v. Williams*, 21-CR-0045-DLF, Gov't Sent. Memo, ECF Doc. 35, 1-2 (the defendant, a firefighter and EMT, "penetrated deep inside the U.S. Capitol," "cheered 'we're storming the U.S. Capitol' while advancing toward the Capitol Building," saw broken glass, took pictures and videos inside, and "his statements in text messages to friends after January 6 reveal[ed] a total lack of remorse.").

Other misdemeanants whom the Court sentenced to probation were involved in encouraging violence or possessed items indicating the defendant anticipated violence. *See e.g., United States v. Straka*, 21-CR-00579-DLF, Gov't Sent. Memo, ECF Doc. 36, 1-2 (the defendant "posted a series of messages to his significant number of social media followers indicating that . . . a civil war had begun, and that "we're not going to be peaceful much longer,'" "incit[ed] the crowd by yelling 'go, go, go,'" and vocally encouraged rioters to take protective equipment from a law enforcement officer protecting the Capitol); *United States v. Walden*, 21-CR-00548-DLF, Gov't Sent. Memo, ECF Doc. 24, 1-2 (the defendant, a military veteran, "anticipated and was prepared for violence by bringing a gas mask to Washington, D.C," scaled a wall and entered through a broken window, took videos and photos inside, "chant[ed] with others 'traitors, traitors, traitors,'" remained inside for nine minutes, and "showed a lack of remorse for his conduct by [later] posting to Facebook . . .").

The Court accounted for variations in offense seriousness and personal circumstances by sentencing misdemeanants to shorter or longer terms of probation and imposing home detention for some defendants. Jason's conduct and his history

and characteristics place him on par with defendants that this Court has sentenced to probation for committing non-violent misdemeanors on January 6, 2021. For example, Jason has no criminal record; he is a veteran; he committed no violent acts and spoke no violent rhetoric; he did not urge violence or join in chants inside the Capitol; he remained in the building for less than fifteen minutes; and, he was honest with the FBI. Jason's offense of conviction differs from the Court's prior misdemeanants in that that he took a book and wine while in the building. Although this differentiates his case from others, it does not represent an escalation of behavior or a heightened degree of dangerousness that would demand a harsher, incarcerative sanction. Jason pled guilty and accepted responsibility for his conduct. The defendant's proposed probationary sentence avoids unwarranted sentencing disparities among those sentenced by this Court and promotes respect for the law.

## VIII.  A Sentence of Thirty Months of Probation Satisfies the Sentencing Purposes Set Forth in 18 USC § 3553(a)(2) and Is Not Greater Than Necessary to Achieve Those Ends.

In addition to Jason's personal history, the nature of the offense, and avoiding unwarranted disparities, the Court must consider the deterrent, punitive, community protection, and rehabilitative purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2) to craft a sentence that is sufficient, but not greater than necessary to achieve those ends. A probationary sentence of thirty months with community services and restitution strikes the appropriate balance of these sentencing goals and is not greater than necessary to achieve those ends.

A conviction, followed by years of supervision and restrictions on personal freedoms that would subject Jason to imprisonment if violated provides just punishment in this case. As the Supreme Court noted in *Gall v. United States*, 552 U.S. 38, 48 (2007), offenders on probation are subject to "conditions that substantially restrict their liberty." *Gall* notes that:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving

> permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court. . . . Probation, if violated, may result in any . . . sentence that initially could have been imposed.

*Id.; see United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'"). These conditions serve multiple purposes, among them promoting respect for the law and serving a punitive function. Here, Jason has lived for the past twelve months under pretrial release conditions that curtail his freedom. His liberty is conditioned on compliance with court orders and probation directives. Per this proposed sentence, he will spend an additional thirty months subject to government observation and court-mandated curtailments of his freedom. He would remain at risk of incarceration should he be noncompliant. The proposed sentence "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Court can meet its obligation to specific and general deterrence through a probationary sentence. Jason does not have a criminal history. He was not in Washington D.C. on January 6, 2021, with a premeditated intent to break the law. He has no intent or desire to become court-involved again. His largely compliant behavior while on pretrial confirmation and lack of new criminal offenses suggests that supervision can adequately deter Jason from future criminal conduct. As to general deterrence, these misdemeanor defendants appear before the courts with an unusual and unprecedented set of circumstances. The public debate as to sentencing options and general deterrence in these cases has been robust. The Court, as evidenced by the cases previously cited, has concluded on at least nine past occasions that broad, general deterrence concerns can be satisfied without imprisonment.

Concerns about general deterrence can be met here through a conviction and the imposition of a probationary sentence.

The Court can satisfy concerns about protecting the public from future crimes of the defendant and rehabilitative interests, described by statute as the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 USC § 3553(a)(2)(D), through probation. Jason's lack of criminal history suggests that Jason is not likely to commit further crimes irrespective of the Court's sentence. To the extent that remains in doubt, probation monitoring of his behavior, movement, employment, etc. over a period of years adequately allays that concern. Although Jason has limited educational or vocational needs, remaining in the community under conditions that call for continued counseling services as needed, will provide Jason "medical care" in the most effective manner. Incarceration is likely to disrupt those services and undermine the stability they provide. A multi-year sentence of probation is "sufficient, but not greater than necessary" to meet the ends of sentencing. *Id.* at § 3553(a). Accordingly, Jason Riddle hereby requests that the Court impose a sentence of thirty months of Probation, community service, and restitution.

Respectfully submitted,

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar #18372
Assistant Federal Public Defender
Eric_Wolpin @fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2022, the above document was served electronically upon all counsel of record through the CM/ECF filing system.

*/s/ Eric Wolpin*
Eric Wolpin